A. FOWLER, Plaintiff,

v.

Sherman BLOCK, et al., Defendants.

No. CV–97–2098–WJR (EX).

United States District Court, C.D. California.

May 15, 1998.

Stephen Yagman, Marion Yagman, Yagman & Yagman, P.C., Venice, CA, for Plaintiff.

Scott D. MacLatchie, Franscell, Strickland, Roberts & Lawrence, A Professional Corporation, Pasadena, CA, Kevin C. Brazile, Principal Deputy County Counsel, Los Angeles, CA, for Defendants.

AMENDED ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF QUALIFIED IMMUNITY TO SHERMAN BLOCK AND DENYING QUALIFIED IMMUNITY TO THE DEPUTY DEFENDANTS

REA, District Judge.

## BACKGROUND

### I. Factual Introduction

The instant matter arises from Plaintiff's claim that he was deprived of his constitutional rights when he was "over-detained" by the Los Angeles County Sheriff's Department.

In his Amended Complaint, Plaintiff alleges that he was acquitted on January 3, 1997 of certain criminal charges in a state court proceeding and then returned to the County Jail and held in custody without proper legal cause until January 5, 1997. (Plaintiff's Amended Complaint at 10.) The gravamen of Plaintiff's claim is that such "over-deten-tion" violated his Fourth Amendment rights since there was no probable cause to "rearrest" him after acquittal, and his Fourteenth Amendment right not to be deprived of liberty without due process of law. In contravention, Defendants argue that such "over-detention" is not a constitutional violation, but rather, a necessary step in performing the required administrative discharge of an incarcerated person.

### II. Relevant Procedural History

#### A. The Initial Pleadings

Plaintiff filed his Complaint on April 1, 1997, naming as Defendants the County of Los Angeles, Sheriff Sherman Block, and Los Angeles County Board of Supervisors Michael Antonovich, Deana Dana, Don Knabe, Yvonne Burke, Gloria Molina, and Zev Yaroslavsky. All individual Defendants were named in both their official and individual capacities.

On June 19, 1997, the Court dismissed Supervisors Antonovich, Dana, Knabe, Burke, Molina, and Yaroslavsky under the doctrine of absolute legislative immunity.

On November 7, 1997, Plaintiff filed his First Amended Complaint wherein Robert Corbett, Sergeant Black, and Sharon Walton were identified as three of the previously unnamed Doe Defendants. Such Defendants were the courtroom deputies involved in returning the Plaintiff to custody, thereby leading to the alleged "over-detention." As in the original Complaint, such individual Defendants were named in both their official and individual capacities.

On January 30, 1998, Plaintiff filed a motion for reconsideration of the Court's June 19, 1997 Order, requesting that the various Supervisors be reinstated as Defendants. Despite reconsideration under Plaintiff's presentation of newly discovered evidence, the Court continued to find that the Supervisors were entitled to absolute immunity. Therefore, Plaintiff's reconsideration motion was denied on its merits.

#### B. The First Motion Now Under Reconsideration: Qualified Immunity for the Deputy Defendants

On January 5, 1998, deputy Defendants Corbett, Black, and Walton (hereinafter

"Deputy Defendants"[1]) filed their motion to dismiss several of the Plaintiff's claims. That motion argued, among other points, that the Deputy Defendants should be dismissed pursuant to the doctrine of qualified immunity. (Defendants' Jan. 5, 1998 Motion to Dismiss at 2.) In granting such immunity, the Court found, in relevant part, that "[i]n the instant case, ... there appears to be no preexisting, established law." (Feb. 2, 1988 Order at 7.) Accordingly, the Deputy Defendants were dismissed with prejudice. (*Id.*)

In that same motion, the Deputy Defendants, Block and the County also sought to dismiss the Plaintiff's civil conspiracy claim on grounds of insufficient pleading. In denying this aspect of the motion, the Court found that the conspiracy claim was properly plead.[2,3]

## C. The Second Motion Now Under Reconsideration: Qualified Immunity for Sheriff Block and the Efficacy of Civil Conspiracy When Dealing With Immune and Non–Immune Defendants

On February 13, 1998, the Deputy Defendants and Sheriff Block filed their Motion for Judgment on the Pleadings pursuant to Fed. R.Civ.P. 12(c). That Motion made three essential arguments: (1) Defendant Block should be dismissed in his official capacity since the County was a named Defendant; (2) Defendant Block should be dismissed in his individual capacity under the doctrine of qualified immunity "for the same reasons outlined in the Court's February 2, 1998 Order granting the Motion to Dismiss by defendants Corbett, Black and Walton[,]" i.e.,

there was no clearly established law. (Defendants' Feb. 13, 1998 Motion for Judgment on the Pleadings at 2.); and (3) Plaintiff's claim for civil conspiracy[4] must be dismissed since Block and the Deputy Defendants were all entitled to qualified immunity under the Plaintiff's constitutional claims.

After oral argument, the Court granted in part, and denied in part, Defendants' Motion. (*See generally* Mar. 27, 1998 Order.) The Court dismissed Block in his official capacity, granted the Deputy Defendants judgment on the pleadings as to civil conspiracy since no underlying Constitutional claim remained as against them, but denied Block's requests for qualified immunity and judgment on the pleadings under the civil conspiracy claim. [*Id.*] In denying such requests, the Court stated the following, in relevant part:

> [The Court denies] Defendant Block's request for qualified immunity in his individual capacity on the Fourteenth Amendment claim[ ] since the Court cannot find qualified immunity on the pleadings alone. Since Defendant Block is a policymaker, there is a question of fact whether he acted reasonably.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [The Court also denies] Defendant Block's Motion for Judgment on the Pleadings with respect to Plaintiff's Count Three Conspiracy claim[ ] since there still may be a viable Fourteenth Amendment claim against Defendant Block.

[*Id.* at 2.]

Of course, the denial of the motion with respect to the conspiracy claim was based, at

---

1. The Court realizes that categorizing all such Defendants as "deputies" may not be true to their official ranks within the Sheriff's Department. However, the Court uses this classification so as to easily identify these Defendants as distinct from Sheriff Block.

2. In this motion, the Defendants only challenged the Plaintiff's claim for civil conspiracy under requisite pleading standards. In a latter motion, discussed below, they raised substantive issues as to the viability of a conspiracy claim when dealing with both immune and nonimmune Defendants.

3. In its complete ruling, this motion was denied in part, and granted in part. Specifically, the Court dismissed the entire Complaint against the

Deputy Defendants in their official capacities, dismissed Plaintiff's Fourth and Eighth Amendment claims, found that all Deputy Defendants were entitled to qualified immunity, dismissed the Plaintiff's race-based conspiracy claim under 42 U.S.C. § 1985 since racial animus was not adequately plead, but denied the motion with respect to Plaintiff's conspiracy claim since conspiracy was adequately plead.

4. Such conspiracy claim is not brought pursuant to 42 U.S.C. § 1985, but rather, is based on general common law principles of conspiracy. (Plaintiff's Supplemental Brief at 8–9.)

least in part, on the Court's finding that Block was not entitled to qualified immunity.

### D. The Motion for Reconsideration Now Before the Court

On March 16, 1998, Defendants filed the instant Motion for Reconsideration of Order Denying Sheriff Block Qualified Immunity. In that Motion, the Defendants argued that the law of the case requires a finding that Block is entitled to qualified immunity. More specifically, since the Court already established, in cloaking the individual deputies with qualified immunity, that there appears to be no preexisting, clearly established law with respect to Plaintiff's alleged over-detention, Defendant Block must also be protected under the immunity doctrine. (Defendants' Mar. 16, 1998 Motion for Reconsideration at 6.) In addition, Defendants sought reconsideration of the Court's ruling on the conspiracy claim since, as argued in the original Motion for Judgment on the Pleadings, Defendants felt that immunity for all individual Defendants was appropriate.

### E. Supplemental Briefing and Reconsideration of the Deputy Defendants' Immunity, Sheriff Block's Immunity, and the Civil Conspiracy Claim

On April 10, 1998, the Court issued its order agreeing to examine its rulings on the issues of qualified immunity and civil conspiracy. While Defendants only sought reconsideration of the denial of qualified immunity as to Sheriff Block, the Court found it appropriate to also re-examine the grant of immunity to the Deputy Defendants. Furthermore, the Court found it necessary to reconsider its findings as to the efficacy of the civil conspiracy claim since its prior decisions were based, at least in part, on the Court's qualified immunity determinations. However, the Court did not limit its reconsideration of the conspiracy claim within the framework of its previous decisions. Rather, the Court undertook to examine the viability of the conspiracy claim whether or not the Deputy Defendants and Sheriff Block were found qualifiedly immune since the County remained in the action as a nonimmune Defendant.

In finding such reconsideration appropriate, the Court requested additional briefing in response to the following five questions:

(1) What is the specific right at issue?

(2) Was such right clearly established at the time of the alleged offense?

(3) If there is a clearly established right, is the issue of qualified immunity [ ] properly addressed in a motion for summary judgment?

(4) If there are disputed issues of fact relevant to a determination of an officer's reasonable conduct under the test for qualified immunity (assuming a clearly established law), can such issues proceed to trial?

(5) If the Court finds that [the Deputy Defendants] and Sheriff Block are entitled to qualified immunity, can the Plaintiff proceed on his theory of conspiracy based on the facts that: (a) immunity does not mean there is no constitutional harm (just that the defendants are immune from the liability it creates); and (b) the [County] is still a Defendant. In other words, can the individuals be used to complete the alleged conspiracy to create liability on the part of the [County] even though they are immune? In briefing this issue, the parties should address the theory of conspiracy as a vehicle to transfer liability from one to another, as under principles of agency.

(April 10, 1998 Order for Supplemental Briefing at 7.)

Accordingly, the following issues are now before the Court: (1) whether the Deputy Defendants and Block are entitled to qualified immunity; and (2) if so, whether a claim for civil conspiracy is still viable by using immune Defendants to hold the County liable.

### DISCUSSION

### I. General Principles Governing Qualified Immunity

### A. The Two Tests Used in the Ninth Circuit

Qualified immunity "shields government officials from civil liability 'insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.'" *Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1388 (9th Cir.1997) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity is an objective inquiry that protects both the public official and society from expending resources inappropriately. *Kirkpatrick v. Los Angeles*, 803 F.2d 485, 490 (9th Cir.1986).

In implementing this standard, the Ninth Circuit has alternatively described both a two-part and a three-part test. *Id.* at 1388 n. 2; *Compare Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir.1997) (two-part test), *and Act Up!/Portland v. Bagley*, 988 F.2d 868, 871–72 (9th Cir.1993) (same), *with Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1388 (9th Cir.1997) (three-part test), *and V–1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir.1997) (same), *and Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.1995) (same).

Under the two-part test, there is qualified immunity if: (1) the law governing the official's conduct was "clearly established;" and (2) under that "clearly established" law, a reasonable officer could have believed that his conduct was lawful. *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir.1997) (citing *Carnell v. Grimm*, 74 F.3d 977, 978 (9th Cir.1996)). Similarly, under the three-part test, there is qualified immunity if: (1) the plaintiff has identified a specific federal statutory or constitutional right that has allegedly been violated; (2) that right was so "clearly established" as to alert a reasonable official to its parameters; and (3) a reasonable officer could have believed his or her conduct was lawful. *Sweaney*, 119 F.3d at 1388 (citing *Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir. 1996)); *accord Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir.1997) (citing *V–1 Oil Co.*, 114 F.3d at 857 (9th Cir.1997)).

**B. Reconciling the Two Tests**

The three-part test requires a plaintiff to deliberately indicate which right he claims to be at issue before he analyzes whether such right was "clearly established." This can be thought of as requiring the plaintiff to deliberately move from the broad to the narrow,

i.e., first, point to the right at issue, then show that such right was clearly established. In the two part test, the Plaintiff simply discusses the "clearly established" right. However, since a plaintiff cannot show that a right is "clearly established" without first indicating which specific right he believes to be at issue, the first issue of the two-part test is nothing more than a combination of the first two facets of the three part test.

■ Therefore, despite the enunciation of two separate tests, there is no substantive difference between them. *See Knox*, 124 F.3d at 1107 n. 2 (where the Ninth Circuit held that its approach to qualified immunity under both tests "has been consistent and essentially equivalent."). Rather, they require the same substantive analysis: (1) is there a clearly established right?; and (2) did the officer act reasonably in the face of that right? [5]

**II. The Parties' Various Burdens of Proof and the Application of Those Burdens to the Plaintiff's Alleged Over–Detention**

**A. The Plaintiff's Burden: The "Clearly Established" Right**

■ Regardless of the exact formulation used, the plaintiff bears the initial burden of showing that the right at issue was clearly established. *Ram*, 118 F.3d at 1310 (citing *Perkins v. City of West Covina*, 113 F.3d 1004, 1008 (9th Cir.1997)); *Sweaney*, 119 F.3d at 1388 (citing *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991)). If the plaintiff fails to meet such burden, the court need not even reach the other issues surrounding qualified immunity. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). For, if there was no clearly established law, a defendant's acts must have been, by definition, "reasonable."

■ In establishing the right at issue, the contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A plaintiff cannot seek to defeat qualified im-

---

5. For the analytical purposes of this Order, the Court uses the two-step approach.

munity by using generally established constitutional norms as the basis for the "clearly established law," but rather, the circumstances of his case must be analyzed. *Id.* at 639–640, 107 S.Ct. 3034. In explaining this principal, the Supreme Court stated the following:

> [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' effective performance of their duties" by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."

*Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (citations omitted)). Accordingly, the plaintiff must "offer more than general conclusory allegations" that the defendant violated some law, right, or provision of the Constitution. *Backlund v. Barnhart,* 778 F.2d 1386, 1389 (9th Cir.1985).

■ However, it is not necessary that the specific wrong at issue has been previously declared unconstitutional or unlawful. Rather, the unlawfulness must only have been apparent in light of existing law. *Newell v. Sauser,* 79 F.3d 115, 117 (9th Cir.1996) (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034); *Ram,* 118 F.3d at 1310 (" 'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful

....' ") (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034).

■ Therefore, while the instant Plaintiff must do more than simply point to the Fourteenth Amendment and claim that the Due Process clause is the clearly established law, he need not go so far as to define the right based on case law identifying the specific factual scenario of his case. This would make qualified immunity almost an absolute bar to any constitutional claim, subjecting the legal doctrine to a would-be laundry list of specific "do's" and "don'ts." Accordingly, the Plaintiff's burden lies somewhere in the middle: he must point to a sufficiently concrete general principle that reasonable officers and deputies would be able to apply to the specific situation of this case and determine that their conduct was inappropriate. *See Chew v. Gates,* 27 F.3d 1432, 1447 (9th Cir.1994) (the "law in question must be sufficiently clear that the unlawfulness of the action would have been apparent to a reasonable official."); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) ("[T]he test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.").

## B. The "Clearly Established" Right Governing the Plaintiff's Alleged Over–Detention

### 1. Over Generalized Rights Must Be Rejected

To the lay observer, it seems obvious that something is inherently wrong with improperly holding a person in custody. This includes situations from wrongful arrest, to wrongful convictions, to holding convicted defendants in jail for a substantial time beyond their court ordered release. Legal premises like the Fourth and Fourteenth Amendments engender the feeling that such improprieties must be wrong and unconstitutional. For, all lay observers are familiar with the bedrock premise that no person can be deprived of life, liberty or property without due process of law.

These sentiments rang out loud and clear during oral argument on the motion for reconsideration. Plaintiff's counsel spoke of the constitution's general proscriptions against holding people in custody after they had been acquitted, arguing that such a practice amounts to nothing more than an improper "rearrest" and illegal over-detention. As such, Plaintiff's counsel argued that there was an obvious constitutional violation and that Defendants cannot be shielded from the concomitant liability.

However, as discussed above, and argued by Defense counsel, such general proscriptions and understandings are not sufficiently concrete under the first prong of the qualified immunity test. They do not define the contours of the "clearly established" right at issue such that a reasonable officer would know that his actions were improper. Rather, they represent the sort of general legal doctrines that the immunity test specifically rejects.

Furthermore, in utilizing such general legal principals, Plaintiff's counsel blurred the line between proving the underlying constitutional violation and defeating the Defendants' claim for qualified immunity. For, while the general lay understanding regarding the release of acquitted defendants will certainly figure-in to the jury's deliberations, it can play no part in this Court's examination of qualified immunity.

### 2. The Plaintiff's Right Was "Clearly Established" by the State Court's Order

■ At first glance, there appears to be no Ninth Circuit case law defining the "clearly established" right at issue, i.e., a criminal defendant's right not to be over-detained after release. However, the Ninth Circuit has held that when determining "clearly established" law in the absence of binding Supreme Court or Ninth Circuit precedent, a court should examine the decisions of other courts. *Kirkpatrick*, 803 F.2d at 490 (citing *Ward v. San Diego County*, 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir.1985)). In so doing, the examining court must determine the likelihood that the Ninth

Circuit or the Supreme Court would adopt the analysis. *Id.*

In the Eighth, Fifth, and Second Circuits, it is a rule of law that a court's final order or judgment defines the "clearly established" right under the qualified immunity standard. *See Slone v. Herman* 983 F.2d 107, 110 (8th Cir.1993); *accord Walters v. Grossheim*, 990 F.2d 381 (8th Cir.1993); *see also Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir.1994) ("We further hold that Phelps and Blackburn are not protected under qualified immunity, due to their knowing and intentional participation in a general policy of racial segregation which remained in effect until 1990 and violated a court order mandating full integration of the prison facility."). What is embodied in that order or judgment serves to provide notice of the protected right at issue. *See Id.*

In *Slone*, a former inmate brought a civil rights action against prison officials for their failure to release him pursuant to a court order suspending his sentence. In its qualified immunity analysis, the court reasoned that the plaintiff's rights became "clearly established" once the order suspending his sentence became final and nonappealable. *Slone*, 983 F.2d at 110.

Similarly, in *Walters*, a prison inmate brought a civil rights suit against prison officials for their failure to comply with a judgment requiring the defendants to transfer him from Level III detention to a less restrictive environment. The court held that when the defendants refused to follow the unstayed judgment, they "deprived [the plaintiff] of his liberty interest in being restored to the less restrictive environment of Level IV." *Walters*, 990 F.2d at 384. In addressing the issue of qualified immunity, the Eighth Circuit approved of its decision in *Slone, supra*, by holding that the "unstayed state court judgment" had the same effect as the "final and nonappealable order" in *Slone*. *Id.* (citing *Slone*, 983 F.2d at 111). As with *Slone*, then, the state court judgment served as the "clearly established" right.

However, in *Salahuddin v. Coughlin*, 781 F.2d 24 (2d Cir.1986), the Second Circuit held that officials may still be protected by qualified immunity when the court order at issue is unclear. In that case, an Attica

inmate filed a certain criminal proceeding to challenge his 60–day confinement order to a Special Housing Unit ("SHU"). *Id.* at 25. The state court judge orally converted the Plaintiff's action from an "article 78 proceeding" to a habeas corpus proceeding, and ruled in his favor. *Id.* The plaintiff was then released from the SHU.

However, once the prison officials received the defendants' notice of appeal, the plaintiff was returned to the SHU to finish his 60–day term. *Id.* at 25–26. Unaware that the original proceeding had been orally converted to a habeas petition, the defendants erroneously thought that the notice of appeal stayed the state court's order. *Id.* at 25. For, the court's original written judgment defining the plaintiff's release only referenced the original "article 78 proceeding" and not the oral transformation to a habeas corpus petition. *Id.*

In addressing the issue of "good-faith immunity," the court found that there was no "clearly established" right. *Id.* The court reasoned that the conflict between the written judgment, the original written motion, and the oral transformation made the court's ultimate judgment unclear. *Id.* at 28.

Accordingly, *Salahuddin* stands for the proposition that if the order is unclear there is no "clearly established law" for purposes of qualified immunity. *Id.*

The approach of the Eighth, Fifth and Second Circuits represents a sound yet simple method of determining "clearly established" law in over-detention cases. A court's order or judgment is concise, deals with the specific criminal defendant at issue, and is known or easily knowable by all the officers and deputies involved. It is not a fuzzy or over-generalized concept of constitutional law, but rather, a very specific formulation of the defendant's rights in each and every case. It is also a very straight-forward standard for a court to apply and officers to follow. For, the officers involved are provided a surefire method of determining the exact right governing their actions: look at the court order.

Therefore, the Court finds that the Ninth Circuit would surely adopt the reasoning and approach of the Eighth, Fifth, and Second Circuits. It is an easy test to apply and falls squarely within the "sufficiently concrete" requirement of the qualified immunity test.

Under this reasoning, then, the Court finds that the "clearly established" right in this case was determined by Judge Richard Neidorf in the underlying criminal trial. Specifically, in his January 3, 1997 Minute Order, Judge Neidorf stated: "Defendant is released." Unlike *Salahuddin,* there was no conflict between different orders or the words used. Therefore, the order was clear and the Defendants should have been aware of it.

## C. The Defendants' Burden: Establishing The Reasonableness of Their Actions in Light of the "Clearly Established" Law

■ Once the Court determines that the right was "clearly established," it must proceed to the second prong of the analysis. *V-1 Oil Co. v. Smith,* 114 F.3d 854, 857 (9th Cir.1997) (quoting *Kelley v. Borg,* 60 F.3d 664, 666 (9th Cir.1995)). Under this prong, the defendant bears the burden of proving that a reasonable official would *not* have known that his actions violated the plaintiff's "clearly established" right, otherwise he is not entitled to the defense. *Penilla v. City of Huntington Park,* 115 F.3d 707 (9th Cir. 1997) (citations omitted); *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir.1994).

■ In applying this standard, an official's conduct is measured only by what " 'a reasonably competent official should know.' " *Walters,* 990 F.2d at 384 (8th Cir.1993) (quoting *Slone,* 983 F.2d at 111). In other words, the second prong looks to "objective reasonableness" and not the actor's good faith. *Slone,* 983 F.2d at 110 (quoting *Burk v. Beene,* 948 F.2d 489, 494 (8th Cir.1991) (internally quoting *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986))).

■ Notwithstanding this, the immunity test allows a defendant considerable room for reasonable error as it protects " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S.

335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

### D. An Examination of the Defendants' Actions in Over–Detaining the Plaintiff

#### 1. The Two Categories of Action Causing the Plaintiff's Over–Detention

The Defendants undertook two separate and distinct categories of action in releasing the Plaintiff from custody. First, they checked for any outstanding wants, holds, or warrants. Second, they processed all the necessary paperwork required to discharge the Plaintiff from custody. Each is explained below.

The first category is a somewhat complex undertaking. As Defense counsel stated during oral argument, "it's not a matter of just checking the wants and warrants system like they do for you on a traffic stop .... We're talking about ... someone who is accused of murder ... and they are going to make sure there are no other wants or holds." (Reporter's Transcript ("RT") at 24.) This means to say that the Defendants sought to make sure that the Plaintiff was not released if there were outstanding warrants for his arrest or he was supposed to appear in another criminal proceeding. Thus, because there were several information sources to investigate and the Sheriff's Department was not endowed with an efficient or very effective computer system, the Plaintiff's criminal check was both time consuming and laborious.

The second category is more ministerial in nature, defined by the administrative activities incident to discharge. Since Plaintiff was a custodial defendant, he needed to be "checked-out" of jail after his ordered release. This meant his personal belongings needed to be returned and his paperwork needed to be processed. In other words, the Sheriff and County needed to modify the appropriate records and files to reflect the Plaintiff's status as a "former" inmate.

During oral argument, both parties discussed these two distinct categories under the general guise of "over-detention" out-processing. They did not differentiate the two as separate types of actions. In as much, Plaintiff's counsel argued that once Plaintiff was ordered released, he should have been able to simply walk free through the courtroom doors and return to law abiding society, and that any type of out-processing, whether checking holds or otherwise, was unreasonable. The Defendants, on the other hand, argued that the entire over-detention process was a necessary part of the Plaintiff's release and that the Defendants were certainly reasonable in their actions, both in the administrative processing and checking for wants and holds.

Despite such arguments, the Court finds that differentiating the categories of activities is not only true to the practical realties of the Plaintiff's release, but analytically concise. It leads to a clearer understanding of the entire process and, in turn, sheds light on how the Court should approach and analyze the Defendants' immunity (which will be made clear below).[6] Thus, the Court employs these two categories in analyzing the instant case and declines the parties' invitation to treat them under the single, undifferentiated category of "release-processing."

#### 2. The Reasonableness and Unreasonableness of the Post–Release Actions

##### a) Administrative Tasks

▮ Administrative steps are a necessary part of an inmate's ordered release and can

---

**6.** Understanding this differentiation also debunks Yagman's argument that defendants who can post bail are afforded their constitutional right to liberty because they simply leave from the courtroom when acquitted, while those in custody are not afforded such right because they must be returned to custody for a certain time. To wit:

> In this case, what you have is a situation where someone who is not wealthy enough to be able to afford bail gets acquitted and can't walk out of the courtroom. Whereas, if someone was out on bail and they were acquitted, they walk

out of the courtroom. It just balks common sense for that to be the case.
(RT at 11.)

Plaintiff's counsel completely failed to recognize that certain administrative processing accompanies every inmate's release, and that that is the reason non-custodial defendants leave directly from the courtroom. Thus, it has nothing to do with providing the wealthy with more rights than the poor, but everything to do with the fact that a non-custodial defendant does not need to have his personal effects returned nor does he have to be "checked-out."

certainly be found reasonable under a qualified immunity analysis. In determining whether such reasonableness exists, a court examines the applicable institutional factors, such as the necessary administrative steps and the number of people to be processed. *Lewis v. O'Grady*, 853 F.2d 1366, 1369 (7th Cir.1988) (citing *Sanders v. City of Houston*, 543 F.Supp. 694, 700–02 (S.D.Tx.1982)); *Llaguno v. Mingey*, 739 F.2d 1186, 1196 (7th Cir.1984), *rev'd on other grounds*, 763 F.2d 1560 (7th Cir.1985); *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 123 (D.C.Cir.1977).

In *Lewis*, an arrestee brought a section 1983 suit alleging false arrest and imprisonment because he was mistakenly identified as an individual for whom there was an outstanding arrest warrant. The plaintiff alleged that the judicial acts of quashing the warrant and dismissing the charges against him constituted a judicial determination of discharge and "consequently [left] no legal basis for his continued detention." *Id.* at 1369, n. 8. The plaintiff went on to argue that the administrative procedures of "returning him to the custody" of the County Department of Corrections, rather than "releasing him immediately," was unreasonable and unconstitutional. *Id.* at n. 9.

In addressing qualified immunity, the court noted that the plaintiff was not judicially released or discharged, but was "set free only after certain administrative steps to verify his identity had been taken." *Id.* In elaborating on this point, the court stated the following:

> We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish—in this case perhaps a number of hours. Reasonable time must be allowed for such matters as transportation, identity verification, and processing. It is virtually impossible to establish an absolute minimum time to meet potential circumstances which might exist.

*Id.* at 1370.

Accordingly, the Seventh Circuit recognized that certain administrative steps are both necessary and reasonable despite the incident effect of limited over-detention.[7]

In *Llaguno*, the plaintiffs brought a section 1983 suit against members of the city police department claiming the defendants violated their civil rights by entering and searching their home without probable cause. One plaintiff alleged that he had been illegally detained for 42 hours. The court held that such detention, without a probable cause determination by a magistrate and without being charged with any crime, violated the plaintiff's due process rights. *Id.* at 1196. In determining the reasonableness of the plaintiff's detention, the court said the following factors must be considered: the time of detention; reasons for the delay; whether the delay was justified by the administrative steps that were necessary to be taken, such as transportation, booking and filing charges; the availability of a judicial officer; and the number of people to be processed. *Id.; see also Sanders v. City of Houston*, 543 F.Supp. 694, 700–02 (S.D.Tex.1982).

Therefore, as with *Lewis*, institutional factors were relevant, if not absolutely necessary, in determining reasonableness.

In the instant case, there has been argument, testimony and evidence regarding the administrative procedures surrounding the Plaintiff's release. Specifically, the Court has been made aware of prisoner and paperwork back-logs, inoperative computer systems, inefficient paper chases, and the simple fact that the jails are overcrowded and the Sheriff understaffed.

As this Court has described above, the "check-out" procedure implemented by jail officials is necessary and cannot be avoided. If a party is taken into custody and put on the County's inmate rolls, he must certainly be removed from those rolls once released. Even if the current procedures are inefficient and time consuming, they nonetheless must be undertaken incident to a person's release.

While certain time spans may be found per se unreasonable, the Court is not faced with such a situation. The evidence shows that Plaintiff was detained for approximately 24

---

7. While the Seventh Circuit remanded the "reasonableness" issue for jury consideration, this

Court finds such procedure unnecessary in this case.

hours, but in no event more than 48 hours. While neither party seems to be sure, it appears that the Plaintiff was ordered released at 3:00 p.m. on a Friday afternoon and physically released late Saturday evening, or very early Sunday morning. (*See* RT at 26.) Under these facts, the Plaintiff's delay due to administrative release procedures cannot be found per se unreasonable. He needed to be processed and his records needed to be properly noted, and that simply took time.[8]

Accordingly, the Court finds that the Defendants' administrative processing activities were both reasonable and necessary. As the cases cited above indicate, the Court must take into account the administrative hurdles and institutional factors, like overcrowding, that affect the Defendants' administrative procedures. Thus, the Court finds that with respect to the first component of the over-detention, i.e., the administrative processing, the Defendants are entitled to qualified immunity.

### b) The Checks for Wants and Holds

The second category of over-detention activities involves the Defendants' checks for all wants and holds as against the Plaintiff. As discussed above, the Defendants undertook this procedure in addition to their administrative processing to make sure the Plaintiff was not wanted for any other outstanding criminal charges.

The central issue surrounding the reasonableness of this second category is not whether the checks should or should not occur. For, Plaintiff concedes that they are completely legal, and if pressed, probably would agree with the Court that they are a practical necessity. Rather, the issue revolves solely around the Defendants' timing.

As Plaintiff's counsel argued before the Court:

> What's reasonable is, about every week or every few days, you can run a check on someone. If you're concerned about it, you run a check. * * * The County, the jail, Sheriff Block easily, if they wanted to, could have a procedure where if somebody goes off to court, they run a warrant check on them in the morning, very easy.

(RT at 12, 16–17.)

The Court agrees. It is usually no surprise to the courtroom deputies, or those responsible for a criminal defendant's custody between the courtroom and the holding cell, that a verdict is about to come down, that the court is considering some motion to dismiss, or that a deal has been reached. Thus, there is no reason why a check for wants and holds needs to occur after a person is released. As Plaintiff's counsel argued, those checks can occur at anytime between the original arrest and the case's ultimate disposition.

Accordingly, in the face of the state court's "clearly established" release order, it was unreasonable for the Defendants to do more than simply "check-out" the Plaintiff after he was returned to custody. If they wanted to scrutinize his criminal record, they should have done so before the state court ordered the Plaintiff's release.

Thus, with respect to the second category of release activities, i.e., the check for wants and holds, neither the Deputy Defendants nor Sheriff Block are entitled to qualified immunity.

### III. The Claim for Civil Conspiracy

As the Court has reconsidered and denied the Deputy Defendants qualified immunity, and continued to deny Defendant Block qualified immunity, the civil conspiracy claim remains a viable cause of action as against all such Defendants. The Court need not pass on this matter any further since the issue of whether immune defendants can complete a conspiracy is now moot.

IT IS SO ORDERED.

---

8. In making this determination, the Court notes that the entire period of over-detention was not devoted to administrative procedures. Rather, from the evidence before the Court, it appears that most of the post-release activity was devoted to checking the Plaintiff's records for wants and holds. Therefore, it is with this understanding that the Court finds the Defendants' administrative actions reasonable, and makes no comment as to such reasonableness if the entire over-detention period had been used to "check-out" the Plaintiff.